UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| ELIZABETH GROOM, et al.<br><br>Plaintiffs,<br><br><br><br>BANK OF AMERICA, FIFTH THIRD BANK, AS SUCCESSOR IN INTEREST TO FIRST NATIONAL BANK OF FLORIDA AND BANK OF CENTRAL FLORIDA; CAROLINA FIRST BANK f/k/a MERCANTILE BANK, SUN TRUST BANK , DUN & BRADSTREET, INC. and<br><br>DOES 1-100 inclusive,<br><br><br><br>Defendants. | 08-cv-_____<br><br><br><br>COMPLAINT FOR:<br>1) BREACH OF FIDUCIARY DUTY;<br>2) AIDING AND ABETTING; BREACH OF FIDUCIARY DUTY;<br>3) AIDING AND ABETTING COMMON LAW FRAUD;<br><br><br><br>4) AIDING AND ABETTING VIOLATION OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT;<br>5) COMMERCIAL BAD FAITH;<br>6) AIDING AND ABETTING VIOLATION OF FLORIDA'S UNIFORM FRAUDULENT TRANSFER ACT;<br>7) GROSSLY NEGLIGENT AND RECKLESS MISREPRESENTATIONS |

**DEMAND FOR A JURY TRIAL**

Plaintiffs (collectively "Plaintiffs") for their Complaint as against Defendants, by and through their undersigned counsel, allege as follows:

1

## INTRODUCTION

1. This case involves the actions and inactions of defendants Bank of America; Fifth Third Bank as successor in interest to First National Bank of Florida and Bank of Central Florida; Sun Trust Bank; Carolina First Bank, formerly known as Mercantile Bank and Sun Trust Bank (collectively referred to as "the Defendant Banks") and Dun & Bradstreet, Inc. ("D&B").

2. At all relevant times, Defendants turned a blind eye, at best, or actively assisted, at worst, a long-term *Ponzi* scheme perpetrated by one Louis J. Pearlman ("Pearlman") that robbed hundreds, if not thousands, of elderly and unsophisticated investors, many who were in their 70's and 80's, out of over $300 million of the investors' life savings by facilitating the sale to these investors of certain illusory investments (hereinafter described and referred to as the "Transcon Investments"). Hereinafter, the *Ponzi* scheme perpetrated by Pearlman and his co-conspirators is referred to as the "Pearlman Fraud."

3. Many of those who purchased the Transcon Investments lost their entire life savings which they amassed by sacrificing and cautiously saving throughout the course of their working lives. The losses at issue are not the simple result of the failure of legitimate investments to perform as expected; rather, this was a massive and pervasive fraud which could not have been perpetrated had Defendants not violated their duties and wittingly or unwittingly facilitated the Pearlman Fraud, thereby rendering substantial assistance to the fraudulent scheme perpetrated by Pearlman, which devastated the Plaintiffs and their families.

## THE NATURE OF THE PEARLMAN FRAUD

4. The term "*Ponzi* Scheme" derives from the notorious Charles Ponzi, who stole millions of dollars from Boston investors in 1920 and describes a financial fraud which is perpetrated by utilizing monies obtained under false pretenses from subsequent investors to pay "interest" or "dividends" and return of principal to earlier investors who have no reason to suspect that no legitimate enterprise is actually generating revenues to make these payments. A *Ponzi* scheme will only last as long as there are new investors who part with their investment funds anticipating unusually high returns. Eventually, the house of cards will have to collapse, usually leaving the later-in-time investors holding the bag and the con-artist promoters in jail. The *Ponzi* scheme perpetrated by Pearlman did not unravel until OFR finally brought injunctive

proceedings against Pearlman in December 2006, after years and years of on-again, off-again investigations by the State, effectively shutting down his operations.

5. From the early 1980's until December 2006, Pearlman and related entities wholly owned by Pearlman such as Transcontinental Airlines, Inc., Trans Continental Travel Services Inc., Clean Systems Technology, Inc., and other related companies and entities (collectively, "Transcon"), offered and sold, and received proceeds from, unregistered and, hence, illegal securities identified either as the "Employee Investment Savings Accounts ( "E.I.S.A."), or as common or preferred stock in one or more of the Transcon companies.

6. The E.I.S.A. savings program was marketed by Pearlman and his cohorts as providing CD and/or savings accounts to friends and family of Transcon, with pass-through Federal Deposit Insurance Corporation ("FDIC") insurance and reinsurance through Lloyd of London and AIG. The preferred stock sold in Trans Continental Travel Services Inc. was slated to pay 10% annual dividends. Stock in other entities was sold as well, including Airship International, Inc., another of the Transcon companies.

7. Unbeknownst to the Plaintiffs and other bilked investors, the Transcon companies were little more than shell companies designed to defraud investors. There was no charter airline with 50 airplanes as presented by Transcon on its balance sheets. Pearlman, the entertainment impresario who obtained fame by promoting the "boy bands" 'NSync and the Backstreet Boys, was expert at moving assets out of one company and into another, and therefore out of reach of creditors. He and his co-conspirators created an elaborate fake accounting scheme, with false data from a fictional accounting firm, creating entirely fabricated financial statements which were summarily republished in D&B reports for well over a decade.

8. By the time the scheme unraveled in late 2006, Transcon had few if any profitable entities or divisions. No actual segregated E.I.S.A savings accounts were ever established for investors and companies issuing preferred stock had little or no income or assets other than deposits from the EISA program. As is typical in *Ponzi* schemes of this nature, Pearlman and his co-conspirators used incoming funds from newer investors to pay principal and interest or dividends to already existing investors.

9. Transcon's E.I.S.A. "savings program" was initially sold by Pearlman and his co-

conspirators directly to investors. As the program expanded, the Transcon Investments were sold through a loose network of sales agents, who were either licensed securities brokers or insurance salespeople and who all reported to Pearlman's chief salesman, Michael Crudele ("Crudele"), someone who has been under continuous investigation by the State for illegally selling unregistered securities and against whom the State had secured a cease and desist order against such illegal conduct back in 2002.

10. Funds paid by Plaintiffs to invest in the Transcon Investments were deposited by Pearlman and his co-conspirators into various Transcon accounts with Defendant Banks.

11. Plaintiffs were to be passive and were not expected or obligated to perform any entrepreneurial effort in conjunction with their Transcon Investments to produce the income or profit, which would result in the payment of the interest.

12. According to an analysis of the Florida Office of Financial Regulation ("OFR"), between January 2003 and December 2006 alone, approximately $118 million in proceeds from the sale of the E.I.S.A. program were received and deposited in the Transcon bank accounts.

13. Investors in the Transcon Investments were never advised that their funds would be paid out to earlier investors for account redemption or as interest payments.

14. Investors in the Transcon Investments were never advised that their funds would be paid to third parties in any manner and all E.I.S.A. investors were led to believe that their funds would be held in segregated accounts with various banks, including the Defendant Banks.

15. Investors in the Transcon Investments were informed:
    a. that the E.I.S.A. program investor funds were held in U.S. bank accounts;
    b. that the FDIC insured each E.I.S.A. account up to $100,000;
    c. that a Lloyd's of London insurance policy and Subsequently an AIG insurance policy covered each E.I.S.A. account;
    d. that a Florida C.P.A. firm, Cohen & Siegel, issued an opinion concerning the E.I.S.A. program on May 3, 1995.

16. Investors in the Transcon Investments, or some of them, were provided a document to demonstrate that Lloyd's of London insured E.I.S.A. accounts in U.S. financial institutions under Lloyd's Policy # 823/AM9 100780 with the "Assured" being Trans

Continental Airlines, Inc. Orlando, Florida, 32819 U.S.A.

17. Investors in the Transcon Investments, or some of them, were either provided reports issued by D&B or were informed of such reports which touted the financial soundness of Transcontinental Airlines, and which reports were based entirely on fictitious reports from Pearlman and his cohorts which D&B accepted as true and incorporated in its own reports over a period of more than a decade.

18. §517.021, Florida Statutes, entitled Definitions, provides at subsection (20) the following definition of a security:

> (20) "Security" includes any of the following:
>
> (a) ...
>
> (f) An evidence of indebtedness.
>
> (q) An investment contract.

19. The Transcon Investments were "securities" as defined by F.S. §517.021 (20)(f) and (q).

20. The Transcon Investments were not "federal covered securities" as defined by F.S. §517.021(10).

21. Upon information and belief, in connection with the sale of the Transcon Investments, no persons were ever registered as an "issuer," "dealer" or "associated person" pursuant to the registration provisions of Chapter 517, Florida Statutes.

22. At all times material to this action, the Transcon Investments offered to Plaintiffs were never registered as "securities" pursuant to the registration provisions of Chapter 517, Florida Statutes.

23. Recommending the investment in the Transcon Investments constitutes the rendering of investment advice.

24. Pearlman and his co-conspirators obtained money from the Transcon Investors by means of a scheme to defraud, and misrepresentations and omissions of material facts in connection with the rendering of investment advice in violation of §517.301 of the Florida Securities and Investor Protection Act, falsely misrepresenting to the Plaintiffs material facts as set forth herein above.

25. In connection with the transactions described above, Pearlman and his co-conspirators also omitted to disclose material facts to the Transcon Investors in violation of §517.301, Florida Securities and Investor Protection Act, as set forth herein above.

26. In connection with the transactions described above, Pearlman and his co-conspirators employed a scheme to defraud and engaged in business which operated as a fraud, as previously set forth herein, all in violation of F.S. §517.301.

27. F.S. §517.301, entitled Fraudulent transactions; falsification or concealment of facts, provides at section (l)(a)1, 2, and 3, the following:

(1) It is unlawful and a violation of the provisions of this chapter for a person:

> (a) In connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of §517.051 and including any security sold in a transaction exempted under the provisions of §517.061, directly or indirectly:
>
> > 1. To employ any device, scheme, or artifice to defraud;
> >
> > 2. To obtain money or property by means of any untrue statement of a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or
> >
> > 3. To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

28. Pearlman and his co-conspirators violated the registration and anti-fraud provisions of the Florida Securities and Investor Protection Act in selling unregistered securities and engaging in fraudulent misrepresentations and omissions in connection with the sale of the Transcon Investments.

29. In late 2006, Pearlman's *Ponzi* scheme began to unravel. Transcon was unable to pay investors interest on their investments or cash people out of their Transcon Investments.

## OFR TAKES ACTION

30. On December 27, 2006, OFR filed suit against Pearlman. In February 2007, the State regulators announced that Pearlman had indeed engaged in a massive fraud and a receiver

was appointed by the Court to take possession of all of the Transcon companies and assets. Later, Pearlman himself and all the Transcon companies filed for bankruptcy, which bankruptcy proceeding is still pending and being jointly administered by a single Trustee, Soneet Kapila.

31. OFR sued Transcon to enjoin the continuing violation of the Florida Securities and Investor Protection Act, Chapter 517, Florida Statutes, and the Florida Financial Institution Code, Chapter 655, Florida Statutes.

32. On May 21, 2008, Pearlman was sentenced to 25 years in federal prison, after pleading guilty to charges of conspiracy, money laundering, and making false statements during a bankruptcy proceeding. U.S. District Judge G. Kendall Sharp gave Pearlman the chance to cut his prison time, by offering to reduce the sentence by one month for every million dollars he helps bankruptcy Trustee Kapila recover. Pearlman is currently in Federal prison serving his sentence.

## JURISDICTIONAL ALLEGATIONS

33. Jurisdiction is proper under 28 U.S.C. section 1332 (d). The matter in controversy exceeds $5,000,000 and at least one Plaintiff is a citizen of a State different from that of a Defendant.

34. Pursuant to 28 U.S.C. section 1391(b), venue in this Court is appropriate. All defendants are subject to personal jurisdiction in the Middle District of Florida, and a substantial portion of the acts underlying the claims contained in this Complaint occurred in this District.

35. Certain Plaintiffs listed in Appendix "A" are individual citizens of the state of Florida. Other Plaintiffs are citizens of other states. All Plaintiffs invested monies in the Pearlman Fraud and have lost approximately a total of at least $40,820,000 as a result of Defendants' conduct.

36. Defendant Bank of America ("Bank of America") is a publicly traded company listed on the New York Stock Exchange ("BAC") headquartered in Charlotte, NC, that operates throughout the United States and in more than 30 foreign countries, providing a variety of banking and non-banking financial services and products domestically and internationally, is a member of the Dow Jones Industrial Average, and is conducting business and banking operations in the State of Florida and this judicial district.

37. Defendant Fifth Third Bank ("Fifth Third") is a state chartered financial

institution located in Grand Rapids, Michigan, which is authorized to do business and is doing business in the State of Florida and in this judicial district which acquired the former First National Bank of Florida in 2005, which itself acquired Central Bank of Florida in 2002, and merged with First National Bank of Florida, Fifth Third Bank being the surviving corporation.

38. Defendant Sun Trust Bank is a publicly traded company listed on the New York Stock Exchange ("STI") headquartered in Atlanta, GA, with total assets of $174.8 billion as of September 30, 2008, and claims to be one of the nation's largest and strongest financial holding companies, which, through its banking subsidiaries, provides deposit, credit, trust, and investment services to a broad range of retail, business, and institutional clients, operating 1,692 retail branches and 2,506 ATMs in Florida and other states in the Southeastern and Mid-Atlantic regions of the United States. As such, it is conducting business and banking operations in the State of Florida and in this judicial district.

39. Defendant Carolina First Bank, ("Carolina") is a South Carolina corporation which is the successor in interest to Mercantile Bank, a Florida Corporation, by reason of merger completed on July 1, 2007, with Carolina First Bank being the surviving corporation. Carolina is a wholly owned subsidiary of The South Financial Group (NASDAQ: TSFG), the largest publicly-traded bank holding company headquartered in South Carolina, which was founded in 1986 and ranks among the top 50 US commercial banks with approximately $14 billion in total assets. Defendant Carolina is conducting business and banking operations in the State of Florida and in this judicial district.

40. Defendant D&B (NYSE:DNB) is a Delaware corporation with a principal place of business in New Jersey, which is authorized and is doing business within the State of Florida and this district, which claims to be the world's leading source of commercial information and insight on businesses for the last 167 years, and which maintains a global commercial database containing more than 130 million business records, allegedly allowing D&B to provide its customers with "quality business information."

### ROLE OF THE DEFENDANTS IN THE PEARLMAN FRAUD

41. Each of Defendant Banks engaged in atypical and irregular banking practices and failed to follow their own internal procedures, which conduct made it possible for Pearlman and

his cohorts to deposit vast sums of money acquired from Plaintiffs and other investors and to convert said funds for improper, non-corporate purposes, which course of conduct would normally have been deemed suspicious activities akin to money laundering of which Defendant Banks were aware or chose to ignore.

42. All Defendants, through their personnel, had actual knowledge of the Pearlman Fraud or certain elements thereof, at all relevant times and assisted Pearlman and his cohorts in their prosecution of the Pearlman Fraud.

43. The Defendant Banks benefitted from the monies which they were able to deposit from the Transcon Investments as well as from the millions of dollars in commercial transactions in which they engaged with Pearlman and from which they earned fees as a direct result of their involvement, receipt and transfer of monies that came from the Pearlman Fraud.

44. By reason of the foregoing, The Defendant Banks had actual and/or constructive knowledge of the Pearlman Fraud.

45. Defendants Banks failed to adhere to the customary and accepted standard of care and failed to monitor incoming deposits and wires and other monies entrusted to them to insure that they were properly handled and documented according to industry and internal standards of practice.

46. The aforesaid conduct and failures of Defendants Banks were in furtherance of and substantially assisted the Pearlman Fraud, absent which the Pearlman Fraud would not have been possible.

47. Defendant Banks knew, or had ample reason to know that the Plaintiffs' E.I.S.A. funds were intended by Plaintiffs to be treated as trust funds and also knew that those funds were being mishandled by Pearlman and his cohorts.

48. Once Defendant Banks were put on notice of a misappropriation of trust funds, they were obligated to take reasonable steps to prevent the misappropriation that an investigation would uncover, yet failed to do so.

49. In addition, Defendant D&B accepted as true and incorporated in its reports all of the false and fraudulent information provided by Pearlman and his cohorts in fictitious financial statements, prepared by a fictitious accounting firm conjured up by Pearlman and his cohort,

which reports were issued over a period of well over a decade.

## COUNT I

## BREACH OF FIDUCIARY DUTY AGAINST DEFENDANT BANKS

50.  Plaintiffs incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

51.  Also as described above, Defendant Banks substantially assisted the Pearlman Fraud and thus breached its fiduciary duties owed to the Plaintiffs.

52.  Plaintiffs have suffered substantial financial injury as a result of Defendant Banks's conduct, as alleged herein.

53.  Defendant Banks engaged in the above-described acts while Defendant Banks had a fiduciary relationship with Plaintiffs. Whereas Defendant Banks was a custodian and/or trustee of Plaintiffs' accounts, Defendant Banks owed a duty of loyalty, a duty to exercise reasonable care and skill, and a duty to deal with them fairly and impartially, which conduct constitutes a breach of Defendant Banks's fiduciary duties, and the result of which was to convince the Plaintiffs that their money was safe and the Transcon Investments were legitimate.

WHEREFORE, Plaintiffs demand judgment for damages, interest, prejudgment interest, attorneys' fees and costs, and for such other and further relief that this Court deems appropriate.

## COUNT II

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST DEFENDANT BANKS

54.  Plaintiffs incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

55.  Under Florida Law, Pearlman and his cohorts acted as fiduciaries with respect to the Transcon Investments which were placed on deposit with Defendant Banks.

56.  Furthermore, under Florida Law (F. S. §673.3061 and §673.3071), signatories on the deposit accounts maintained by Pearlman's companies, signatories such as Pearlman himself, act as fiduciaries with respect to the funds on deposit in said deposit accounts, the source of which was the funds invested by Plaintiffs, among others, in the Transcon Investments.

57.  Pearlman and his cohorts, as signatories on the various Pearlman corporate

accounts, violated their fiduciary duties by negotiating instruments for non-corporate purposes, which conduct was facilitated by Defendant Banks, all to the detriment of Plaintiffs who are considered "represented persons" within the meaning of the statutes.

58. Defendant Banks acted on those instructions from Pearlman and his cohorts even though Defendant Banks had notice of the fiduciary nature and notice of his/their breach of his/their fiduciary duty.

59. Pearlman and his co-conspirators, having rendered investment advice to the Plaintiffs, were themselves fiduciaries owing a fiduciary duty of care to the Plaintiffs.

60. Defendant Banks and D&B had knowledge of the Pearlman Fraud, or at least some of the elements of the Pearlman Fraud and rendered substantial assistance to Pearlman and his co-conspirators in their fraudulent conduct.

61. As a result of Defendants' aiding and abetting the Pearlman Fraud and Pearlman's breaches of fiduciary duties, the Pearlman Fraud was allowed to grow and flourish, causing Plaintiffs to suffer damages, with interest thereon, in an amount to be determined at trial.

WHEREFORE, Plaintiffs demand judgment for damages, interest, prejudgment interest, attorneys' fees and costs, and for such other and further relief that this Court deems appropriate.

## COUNT III
### AIDING AND ABETTING COMMON LAW FRAUD AGAINST ALL DEFENDANTS

62. Plaintiffs incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

63. Defendant Banks and D&B had knowledge of the Pearlman Fraud, or at least some of the elements of the Pearlman Fraud and rendered substantial assistance to Pearlman and his co-conspirators in their fraudulent conduct.

64. As a result of Defendants' aiding and abetting Pearlman and his co-conspirators, the Pearlman Fraud was allowed to flourish, and Plaintiffs suffered damages, with interest thereon, in an amount to be determined at trial.

65. Plaintiffs have suffered substantial financial injury as a result of Defendants' conduct, as alleged herein.

WHEREFORE, Plaintiffs demand judgment for damages, interest, prejudgment interest,

attorneys' fees and costs, and for such other and further relief that this Court deems appropriate.

## COUNT IV

## AIDING AND ABETTING VIOLATION OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT AGAINST ALL DEFENDANTS

66. Plaintiffs incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

67. Defendants aided and abetted Pearlman and his co-conspirators, acting in concert with various sales agents at their control, and in connection with the offer and sale of an investment or security as represented by the Transcon Investments by providing substantial assistance to Pearlman and his co-conspirators who employed various devices, schemes, or artifices to defraud Plaintiffs in connection with their purchase of the Transcon Investments through custodial accounts maintained with Defendants.

68. Defendants aided and abetted Pearlman and his co-conspirators, acting in concert with various sales agents at their control, in connection with the offer and sale of an investment or security as represented by the Transcon Investments by providing substantial assistance to Pearlman and is co-conspirators who directly or indirectly obtained money or property, often monies directed through Plaintiffs' Defendants custodial accounts, by means of an untrue statement of a material fact or by an, omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

69. Defendants aided and abetted Pearlman and his co-conspirators, acting in concert with various sales agents at their control, in connection with the offer and sale of the Transcon Investments by providing substantial assistance to Pearlman and his co-conspirators who obtained money or property through the offer and sale of unregistered securities within the state of Florida.

70. Defendants aided and abetted Pearlman and his co-conspirators, acting in concert with various sales agents at their control, in connection with the offer and sale of the Transcon Investments by providing substantial assistance to Pearlman and his co-conspirators who obtained money or property through the offer and sale of unregistered securities within the state

of Florida, even though none of the parties were registered as securities salesmen with the State of Florida.

71. Pursuant to F.S. § 517.211(2), remedies available in cases of unlawful sale, Plaintiffs are entitled to damages and/or rescission from all Defendants.

WHEREFORE, Plaintiffs demand judgment for rescission, damages, interest, prejudgment interest, attorneys' fees and costs, and for such other and further relief that this Court deems appropriate.

## COUNT V
## COMMERCIAL BAD FAITH AGAINST DEFENDANT BANKS

72. Plaintiffs incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

73. Defendant Banks, by facilitating the Pearlman Fraud, engaged in a scheme or acts of wrongdoing with actual knowledge of the scheme or wrongdoing that amounts to bad faith

74. Alternatively, bank principals acted in confederation with Pearlman and his cohorts which conduct constitutes commercial bad faith.

75. Defendant Banks had sufficient knowledge of the Pearlman Fraud and the improper use of Plaintiffs' funds as to be on notice that reporting of such suspicious activities was required under the USA Patriot Act.

76. Defendant Banks rendered substantial assistance to Pearlman and his cohorts in the removal from corporate accounts of the very funds invested by Plaintiffs and other investors so that these funds would be out of the reach of investors or other creditors.

77. Responsible officers of Defendant Banks were aware of these suspicious activities and failed to conduct internal investigations or reporting to governmental officials, including the State of Florida, the illegal and fraudulent nature of the Pearlman Fraud, which investigation and reporting would have rendered the Pearlman Fraud impossible to continue.

78. Under U.C.C. Article 3 (F.S. § 673, et seq.), applicable when a transferee acts dishonestly with actual knowledge of facts and circumstances that amount to bad faith, the

transferee, here the Defendant Banks, become a participant in a fraudulent scheme and liable to victims of said fraud.

WHEREFORE, Plaintiffs demand judgment for rescission, damages, interest, prejudgment interest, attorneys' fees and costs, and for such other and further relief that this Court deems appropriate.

## COUNT VI

### AIDING AND ABETTING VIOLATION OF FLORIDA'S UNIFORM FRAUDULENT TRANSFER ACT AGAINST DEFENDANT BANKS

79. Plaintiffs incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

80. As part of the Pearlman Fraud, Plaintiffs monies that had been deposited in or with Defendants Banks were permitted by Defendant Banks to be improperly transferred to third party accounts or to other third parties.

81. The aforesaid transfers were done without Plaintiffs' knowledge or consent and without consideration being given to Plaintiffs.

82. The aforesaid transfers were conducted at a time that Defendants Banks knew or should have known that the transfers were unauthorized, improper and illegal.

83. The aforesaid transfers were made in part by Defendants Banks to use Plaintiffs' monies to re-pay Defendant Banks sums owed by Pearlman and his cohorts or to pay debt that Defendant Pearlman or his companies owed to third parties, or simply to permit these funds to be misappropriated.

84. The aforesaid transfers were also made to hinder, delay or defraud the Plaintiffs' ability to recover their monies.

85. The aforesaid transfers violated Florida's Uniform Fraudulent Transfer Act ("UFTA") found in F.S. §726.105.

86. Plaintiffs are all creditors of Pearlman and the Transcon companies as that term is defined in UFTA.

87. Had Defendant Banks not permitted the misuse of Plaintiffs' funds by Pearlman and his cohorts, those funds would have been available to pay the losses incurred by Plaintiffs.

88.   By reason of the foregoing, Defendant Banks have aided and abetted Pearlman and his cohorts in violating the UFTA all to Plaintiffs' damage.

WHEREFORE, Plaintiffs demand judgment for rescission, damages, interest, prejudgment interest, attorneys' fees and costs, and for such other and further relief that this Court deems appropriate.

## COUNT VII

### GROSSLY NEGLIGENT AND RECKLESS MISREPRESENTATIONS AGAINST D&B

89.   Plaintiffs incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

90.   Where a course of conduct is such that the likelihood of injury to property is known by the actor to be imminent, then that negligence is considered gross negligence.

91.   The reports issued by D&B were flagrantly false and based entirely upon fictitious reporting by Pearlman and his cohorts which a minimal amount of investigation by D&B would have disclosed to be entirely without basis.

92.   D & B was aware that its false reports were highly likely to cause imminent loss to its subscribers who relied on those reports.

93.   D & B knew that there was no basis for the ratings it was assigning to Pearlman and Transcon.

94.   It was reasonably foreseeable that investors such as Plaintiffs would rely on D&B's ratings in making their investment decisions.

95.   Yet D&B continued to give Pearlman's companies favorable ratings and reports despite its knowledge of Pearlman's fraud.

96.   D&B engaged in gross negligence and evinced a reckless disregard for the accuracy of its reports for a period of at least ten years all to the detriment of the Plaintiffs who had no reason to disbelieve the financial information reported by D&B.

97.   Plaintiffs either were presented with copies of the D&B reports or were advised by Pearlman and his cohorts that D&B had issued favorable credit reports concerning Pearlman and the Transcon companies.

98. Had D&B performed a minimum of due diligence and not acted recklessly, and had D&B reported information readily available to its personnel, Pearlman and his cohorts would not have been able to perpetuate the Pearlman Fraud and Plaintiffs' losses would have been avoided.

WHEREFORE, Plaintiffs demand judgment for rescission, damages, interest, prejudgment interest, attorneys' fees and costs, and for such other and further relief that this Court deems appropriate.

Dated: December 24, 2008

Respectfully Submitted:

Robert J. Pearl, Esquire
FBN: 0255297
Pearl Malarney Smith, PC
649 5th Ave. South
Naples, FL 34102
Tel. 239-659-1005
Fax 239-659-1007
robert@investorattorneys.com

James F. Lowy, Esquire
FBN: 0081434
Lowy Law Firm, LLC
3907 Henderson Blvd., Suite 200
Tampa, FL 33629-5761
Tel: 813-288-9525
Fax: 813-282-0384
Email: jameslowy@LowyLawFirm.com

**Appendix A**

| NAME | TOTAL |
|---|---|
| Alkow, Beverly (IRA) | $612,154.45 |
| Andrews, Fred (IRA) | $123,877.79 |
| Arkin, Deborah (EPP) | $19,515.94 |
| Arkin, Steven (IRA) | $119,432.93 |
| Barrett, Joanne (Rollover) | $63,614.39 |
| Bernstein, Joan (IRA) | $185,725.37 |
| Bernstein, Maurice (IRA) | $105,087.99 |
| Boenig, Jeffrey (IRA) | $34,309.65 |
| Chitester, Lester (IRA) | $51,375.07 |
| Chitester, Mary (IRA) | $143,207.93 |
| DeWalt, David Allen (Rollover IRA) | $169,047.47 |
| DeWalt, David Allen (Pension Plan) | $19,945.30 |
| Dexter, Lynn (IRA) | $24,916.89 |
| Dynasty Construction **401K** (FISERV statement shows: $854,573.23; Indivdual accts total: $913,044.97) Barrett, John, (Dynasty) As Trustee | $913,044.97 |
| Hirschmann, France (Emp. Pension Plan) | $3,500.00 |
| Hirschmann, France (IRA) | $12,933.46 |
| Hirschmann, Kenneth (IRA) | $339,356.49 |
| Jonas, Barry (IRA) | $284,966.89 |
| Kesinger, Margie (IRA) | $74,298.06 |
| Kesinger, Margie (Rollover) | $4,726.43 |
| Miller, Wayne A. (Rollover) | $34,039.33 |
| Monks, Rosalie (IRA) | $78,852.76 |
| Nevler, Leda (IRA) | $36,178.60 |
| Paaso, Theodora (Rollover) | $27,882.91 |
| Parr, Stephen (Simple) | $107,191.01 |
| Pashayan, Maria Dr. (Keogh) | $328,327.31 |
| Pashayan, Maria Dr. (IRA) | $50,850.85 |
| Pashayan, Richard Dr. (Keogh) | $1,308,595.90 |
| Pashayan, Richard Dr. (IRA) | $50,487.37 |
| Provenzano, Linda (IRA) | $86,394.56 |
| Reed, Beverly (IRA) | $100,927.54 |
| Richardson, Elizabeth (IRA) | $131,272.59 |
| Rosen, Paula (IRA) | $13,103.56 |
| Rosen, Paula (IRA) | $77,648.90 |
| Rothschild, Jerome (IRA) | $45,000.00 |
| Sarin, Sheryl (IRA) | $12,848.84 |
| Scheller, Frederick (Rollover) | $19,816.01 |
| Scheller, Libia (Rollover) | $9,316.60 |
| Swette, Dominique (IRA) | $116,734.08 |
| Williams, James (IRA) | $85,141.34 |
| Wright, Betsy (IRA) | $322,639.95 |
| Wright, Gregory (IRA) | $198,180.80 |
| TOTAL | $6,546,468.28 |